UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

DANIEL ROMERO and JOANN RAGUSA,

                        Plaintiffs,                          **09-cv-665 (ARR)**

        -against-                                           **NOT FOR PRINT OR**
                                                            **ELECTRONIC**
BORDEN EAST RIVER REALTY LLC and                            **PUBLICATION**
JOSEPH SIMONE,

                        Defendants.                         **<u>OPINION & ORDER</u>**

-----------------------------------------------------------------------x

WILLIAM LEE and SZUYU PAN,

                        Plaintiffs,                          **09-cv-1721 (ARR)**

        -against-


BORDEN EAST RIVER REALTY LLC and
JOSEPH SIMONE,

                        Defendants.

-----------------------------------------------------------------------x

KYUNG YEOL SHIN,

                        Plaintiff,                           **09-cv-845 (ARR)**

        -against-


BORDEN EAST RIVER REALTY LLC and
JOSEPH SIMONE,

                        Defendants.

-----------------------------------------------------------------------x

LORA KAYE,

                        Plaintiff,                           **09-cv-1228 (ARR)**

        -against-


BORDEN EAST RIVER REALTY LLC and
JOSEPH SIMONE,

                        Defendants.

-----------------------------------------------------------------------x

```
-------------------------------------------------------------------x
```
JOHN GAENZLER and SARA MOSCOSO-GAENZLER,
                                   Plaintiffs,             **09-cv-1303 (ARR)**

     -against-

BORDEN EAST RIVER REALTY LLC and
JOSEPH SIMONE,
                                     Defendants.
```
-------------------------------------------------------------------x
```
ANTHONY ALLICINO,
                                     Plaintiff,              **09-cv-1455 (ARR)**

     -against-

BORDEN EAST RIVER REALTY LLC and
JOSEPH SIMONE,
                                     Defendants.
```
-------------------------------------------------------------------x
```
JULIE AND DAVID LIEVRE,
                                     Plaintiffs,             **09-cv-1984 (ARR)**

     -against-

BORDEN EAST RIVER REALTY LLC and
JOSEPH SIMONE,
                                     Defendants.
```
-------------------------------------------------------------------x
```
ZACK FERGUSON-STEGER,
                                     Plaintiff,              **09-cv-1196 (ARR)**

     -against-

BORDEN EAST RIVER REALTY LLC and
JOSEPH SIMONE,
                                     Defendants.
```
-------------------------------------------------------------------x
```

ROSS, United States District Judge:

       Plaintiffs in the instant actions are purchasers of pre-construction condominium units

from the Defendant, Borden East River Realty, at One Hunters Point Condominium in Long

Island City, New York.  Plaintiffs filed individual complaints seeking to rescind their purchase

agreements and obtain a refund of their deposits due to defendant's alleged failure to comply with the requirements of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701-1720 (2009) ("ILSA" or the "Act").  Defendants claim that the condominiums in question qualify for certain exemptions under the Act.  Presently before this court are the parties' cross motions for summary judgment.  For the reasons set forth below, plaintiffs' partial motion for summary judgment is denied and defendants' motion for summary judgment is granted.

## BACKGROUND

The following facts are undisputed and, unless otherwise noted, are found in the parties' Joint Statement of Undisputed Material Facts. (No. 09-cv-665, Dkt. No. 32.)

Borden East River Realty LLC ("Borden East") is the sponsor of the condominium development at 5-49 Borden Avenue, Long Island City, New York, known as Hunters Point Condominium ("Hunters Point").  Joseph Simone, the individual defendant, is identified as the principal of Borden East.  On September 11, 2007, a New York State Offering Plan (the "Offering Plan") was filed with the New York State Attorney General's Office on behalf of Hunters Point which indicated that the condominium would consist of 132 residential units, twenty-six roof terrace units, and twenty-five parking space units, all of which were open for sale to the general public after the filing date.

Plaintiffs commenced their purchases of uncompleted units in the condominium in October 2007.  Plaintiffs John Gaenzler and Sara Moscoco Gaenzler (the "Gaenzlers") signed a contract to purchase units 7D and R17 on October 18, 2007 for $718,885 and paid a deposit of $71,885.  Plaintiff Anthony Allicino ("Allicino") signed a contract to purchase unit 6L on October 25, 2007 for $604,410 and paid a deposit of $60,410.  Plaintiff Kyung Yeol Shin ("Shin") signed a contract to purchase unit 4M on October 31, 2007 for $755,800 and paid a

deposit of $75,580.  Plaintiff Zack Ferguson-Steger ("Ferguson-Steger") signed a contract to purchase unit 3J on November 1, 2007 for $494,462 and paid a deposit of $49,462.  On November 29, 2007, plaintiff Lora Kaye ("Kaye") signed a contract to purchase units 2E and Rooftop 1 for $666,000 and paid a deposit of $66,600.  Also on that date, plaintiffs Julie and David Lieve (the "Lieves") signed a contract to purchase unit 10K for $965,300 and paid a deposit of $96,530.  On December 19, 2007, plaintiffs Daniel Romero and Joann Raguso ("Romero and Raguso") signed a contract to purchase unit 4M for $755,800, and paid a deposit of $75,580.  Finally, Plaintiffs William Lee and Szuyu Pan ("Lee and Pan") signed a contract to purchase unit 6D on November 7, 2008 for $672,380 and paid a deposit of $67,238.00. Prior to executing their contracts to purchase units in Hunters Point, plaintiffs were provided with a copy of the Offering Plan.

The Hunters Point project is promoted under one "common promotional plan" with a separate condominium development known as Hunters View Condominium ("Hunters View"), located at 48-15 11th Street, Long Island City, New York.  11/49 Realty Company, LLC ("11/49") is the sponsor of the Hunters View project, and a New York Public Offering Plan was filed with the New York Attorney General's Office on September 11, 2007 ("Hunters View Offering Plan").  Hunters View consists of seventy-two residential units, fifteen roof terrace units, and thirty-seven parking space units, all of which were open for sale to the general public after the filing date.[1]

Between January 26, 2009 and April 16, 2009, plaintiffs' counsel sent eight letters to defendant Simone notifying him of the plaintiffs' decision to exercise "their right to terminate

---

[1] Hunters View initially consisted of seventy-three residential units.  Units 8A and 8B were subsequently combined into a single unit, however, and pursuant to the tenth amendment to the Hunters View Offering Plan filed on or about March of 2008, the number of offering units was reduced to seventy-two, and unit 8A/8B was sold as a single unit.

the Purchase Agreement" based upon "a complete failure . . . to comply with the requirements of" ILSA. See, e.g., Letter to Joseph Simone, Apr. 16, 2009, No. 09-cv-665, Dkt. No. 31-3. Plaintiffs claimed that since Borden East failed to comply with the terms of the Act, they were entitled to rescission of their purchase agreements and return of their deposits.

Defendants do not dispute that when the Offering Plans for both Hunters Point and Hunters View were filed on September 11, 2007, Borden East and Mr. Simone had never heard of ILSA, made no reference to the Act or its regulations in the Offering Plans, made no reference to the Act in any of the purchase agreements, and had no plan in effect for sales in either Hunters Point or Hunters View to become exempt from the requirements of ILSA. Defendants became aware of ILSA around December 2007, but initially believed that by filing the Offering Plans for Hunters Point and Hunters View with the New York State Attorney General, they provided all the necessary disclosure. After receiving the first of plaintiffs' letters dated January 26, 2009, they began to more fully investigate the allegations of ILSA violations. Defendants also concede that they did not file a statement of record with the federal Department of Housing and Urban Development ("HUD"), or provide plaintiffs with a written property report prior to execution of their purchase agreements.

Borden East received a Temporary Certificate of Occupancy ("TCO") on February 17, 2009 for Hunters Point.[2] One unit was sold on the date the TCO was issued, and fifty-seven residential units were unsold. 11/49 received a TCO for the Hunters View project on March 12, 2009. At that point, forty-seven residential units were unsold, and one unit which had previously been sold, was sold to someone who purported to have acquired it for purposes of resale and lease. Based on the number of unsold residential units, Borden East and 11/49 determined that the combined Projects were exempt from ILSA's requirements under a combination of three

---

[2] A TCO is issued when a unit can be legally occupied.

listed exemptions:  the Hundred Lot Exemption, 17 U.S.C. § 1702(b)(1), the Improved Lot Exemption, 15 U.S.C. § 1702(a)(2), and the sale to a person for purpose of resale under 15 U.S.C. § 1702(a)(7).

On March 6, 2009, defendants received an inquiry from HUD as to the Projects' compliance with ILSA.  Defendants responded to the inquiry on April 2, 2009, and on April 14, 2009, they requested that their response also be treated as a request for an advisory opinion from HUD as to whether Hunters View and Hunters Point were exempt from the registration requirements of ISLA.[3]  Based on the number of units sold at the time the TCOs were issued, defendants asserted that only ninety-eight units were sold within the meaning of ILSA, and thus the Projects were exempt from the Registration Statement and Statement of Record requirements.

On July 15, 2009, HUD issued an advisory opinion finding that parking units and rooftop units needed to be counted as "lots" sold for purposes of the Hundred Lot Exemption.  Therefore, HUD determined that the projects were not exempt from ILSA's registration requirements. (July 15, 2009 Advisory Opinion, Defs.'Ex. J.)  Two days later, on July 17, 2009, HUD issued another advisory opinion that did not include the parking units and rooftop units in the calculation of units sold, and determined that the projects were exempt from registration under the applicable exemption. (July 17, 2009 Advisory Opinion, Defs.'Ex. K.)

On February 18, 2009, the first of the plaintiffs, Daniel Romero and Joann Ragusa, filed their complaint.  On May 14, 2009, all eight cases were reassigned to me as related cases.  The

---

[3] Additional written submissions were made in response to HUD requests on April 23, 2009, May 18, 2009, and May 29, 2009.  (Defs.' Ex. D, E, F, G, H, I.)

parties now cross-move for summary judgment on the proper interpretation of ISLA, that is, whether the projects are exempt from the Act's registration and disclosure requirements.[4]

## DISCUSSION

### A. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, depositions, answers, interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(c).  An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome of the litigation if application of the relevant substantive law requires their determination. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Cartrett, 477 U.S. 317, 323 (1986).  The substantive law determines the facts that are material to the outcome of a particular litigation. See Anderson, 477 U.S. at 250; Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

When considering cross-motions for summary judgment, a court "'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences

---

[4] Plaintiff's motion for partial summary judgment is against Borden East only. (Pls.' Br. in Support at 2, n.1.)

against the party whose motion is under consideration.'" Hotel Employees & Rest. Employees

Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d

Cir. 2002) (quoting Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)).  In the

case at hand, the underlying facts are not in dispute, and the matter turns on the proper

interpretation of ILSA.

    B.  <u>The Interstate Land Sales Full Disclosure Act</u>

        1.  *The Act's Requirements and Exemptions*

The Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701-1720 (2009) was

enacted as part of the Housing and Urban Development Act of 1968, Pub.L. No. 90-448, Title

XIV, 82 Stat. 590 (1968), and was amended in 1979. <u>See</u> Pub.L. No. 96-153, Title IV, 93 Stat.

1122 (1979). The Act was "designed to prevent false and deceptive practices in the sale of

unimproved tracts of land by requiring developers to disclose information needed by potential

buyers." Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 778, 96 S.Ct. 2430,

49 L.Ed.2d 205 (1978).  Although the Act's primary purpose is to "protect purchasers from

unscrupulous sales of undeveloped home sites," it also applies to the sale of developed land,

including the sale of condominiums. <u>See</u> Winter v. Hollingsworth Props., Inc., 777 F.2d 1444,

1447-48 (11th Cir. 1985).  The Act makes it unlawful for a developer of a covered "subdivision"

to "to sell or lease any lot unless a statement of record with respect to such lot is in effect ... [and]

a printed property report . . . has been furnished to the purchaser or lessee in advance of the

signing of any contract or agreement by such purchaser or lessee." 15 U.S.C. § 1703(a)(1); <u>see</u>

<u>also</u> 24 C.F.R. § 1710.3.[5]

---

[5] "Subdivision" under the Act is defined as "any land which is located in any State or in a foreign country and is
divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of a
common promotional plan." 15 U.S.C. § 1701(3). "Common promotional plan" is defined as "a plan, undertaken by

Unless an exemption applies, the developer must provide the property report to the purchaser prior to executing the purchase agreement. 15 U.S.C. § 1703(a)(1) (B).  When a developer fails to provide the report, the purchaser may revoke his contract within two years from the date of signing, id. § 1703(c), and may be entitled to a return of any monies paid pursuant to the agreement. Id. § 1703(e).  The purchaser's right of revocation must be acknowledged in the purchase agreement. Id. § 1703(c).

The applicable exemptions under the Act fall into two categories:  (1) full statutory exemptions, found in 15 U.S.C. § 1702(a), which discharge a developer from the Act's disclosure and registration requirements as well as its antifraud provisions; and (2) partial statutory exemptions, found in 15 U.S.C. § 1702(b), which discharge a developer from the Act's disclosure and registration requirements, but not its anti-fraud provisions.  One of the exemptions at issue, the Hundred Lot Exemption, 15 U.S.C. § 1702(b)(1), provides in pertinent part:

> Unless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions requiring registration and disclosure ... shall not apply to the sale or lease of lots in a subdivision containing fewer than one hundred lots which are not exempt under [§ 1702(a)].

15 U.S.C. § 1702(b)(1).  Another exemption at issue, the "Improved Lot Exemption," is available under § 1702(a) and exempts "the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building, or the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years." 15 U.S.C. § 1702(a)(2).  Finally, 15 U.S.C. § 1702(a)(7) exempts "the sale or lease of lots to any person who acquires such lots for the purpose of engaging in the business of constructing residential, commercial, or industrial buildings or for the purpose of resale or lease of such lots to

---

a single developer or a group of developers acting in concert, to offer lots for sale or lease." Id. § 1701(4). Defendants concede that Hunters Point and Hunters View are promoted under one common promotional plan as defined by § 1701(4).

persons engaged in such business." 15 U.S.C. § 1702(a)(7).  The exemptions apply "unless the method of disposition is adopted for the purpose of evasion" of the Act. 15 U.S.C. § 1702(a), (b).

Essentially, by combining the Hundred Lot Exemption, § 1702(b)(1), and the Improved Lot Exemption, § 1702(a)(2), defendants claim that the projects are exempt from the Act's registration and disclosure requirements.[6]  Defendants assert that because fewer than one hundred uncompleted residential units were sold at the time the TCOs were issued for the projects, and because the remaining units were sold as completed units or units "under contract obligating the seller or lessor to erect such a building . . . within a period of two years," 15 U.S.C. § 1702(a)(2), the Act's exemptions apply.  Plaintiffs' primarily argue that the developer's compliance with ILSA is measured at the time the purchase agreement is executed, not when the TCO is issued.  Plaintiffs thus claim that defendants cannot "piggyback" the exemptions to evade the Act's requirements.  Additionally, plaintiffs argue that the Condominium's roof terrace and parking units should be counted as "lots" under the Fewer Than 100 Lot Exemption.  Plaintiffs assert that because the developers failed to comply with ILSA, they are entitled to their statutory right of rescission of their purchase agreements and return of their deposits.

### 2. *A Plain Reading of the Statute Does Not Preclude the Combination of Exemptions at Issue*

"Statutory interpretation always begins with the plain language of the statute, assuming the statute is unambiguous." Universal Church v. Geltzer, 463 F.3d 218, 223 (2d Cir. 2006), cert. denied, 549 U.S. 1113 (2007).  When a court determines that the language of a statute is unambiguous, "the sole function of the courts is to enforce it according to its terms." United

---

[6] Plaintiffs do not allege that defendants violated any of the Act's anti-fraud provisions.  Thus, these provisions are not at issue.

States v. Hasan, 586 F.3d 161, 167 (2d Cir. 2009) (citing United States v. Kozeny, 541 F.3d 166,

171 (2d Cir. 2008).

The text of § 1702(b)(1) states that ILSA's registration and disclosure requirements do

not apply to "the sale or lease of lots in a subdivision containing fewer than one hundred lots

which are not exempt under [ § 1702(a) ]." 15 U.S.C. § 1702(b)(1).  In a recent case in the

Southern District of New York, a court found ILSA's language at issue to be clear. Bodansky v.

Fifth on the Park Condo, LLC, 2010 WL 334985, at *4 (S.D.N.Y., January 29, 2010).  The court

found:

> The plain meaning of the text is that as long as the "subdivision" contains "fewer
> than one hundred" non-exempt lots, then the Act's registration and disclosure
> requirements do not apply to the sale of lots in that subdivision. Thus, the Hundred Lot
> Exemption can still apply to a subdivision containing one hundred or more lots as long as
> all lots sold above the ninety-nine non-exempt lots maximum will be covered by a §
> 1702(a) exemption. For instance, the Hundred Lot Exemption applies where a developer
> contracts to sell up to ninety-nine non-exempt lots in a 200-lot subdivision, but will sell
> the remaining 101 lots either as improved lots or pursuant to contracts obligating the
> developer to improve the lots within two years.

Id. at *4.

I find no reason to disagree.  A plain reading of the statute does not support plaintiff's

position that compliance with the Fewer Than 100 Lot exemption is measured at the time the

purchase agreement is signed.  As in Bodansky, plaintiffs point to nothing in the text of ILSA to

suggest that eligibility for the Fewer Than 100 Lot exemption must be determined prior to the

sale of any of the first ninety-nine lots. Id.  The statute simply exempts from registration and

disclosure the sale of lots in a subdivision in which there are fewer than one hundred lots which

are not otherwise exempt under § 1702(a).  It says nothing about the applicable timing of the

exemption, or the need for the developer to have a disclosed "plan" in place at the time the first

ninety-nine lots are sold.

Congress did include timing requirements in other exemptions under § 1702(b), but made no such reference in the exemption at issue. See § 1702(b)(2) (providing an exemption for "the sale or lease of lots in a subdivision if, within the twelve-month period commencing on the date of the first sale or lease of a lot in such subdivision . . . not more than twelve lots are sold or leased . . ."); § 1702(b)(5)(E) ("at the time of closing . . ."). The absence of a timing requirement in § 1702(b)(2) "demonstrates that Congress did not intend such a limitation to be read  into the Hundred Lot Exemption." Bodansky, 2010 WL 334985 at *5 (citing McInerny v. Rensselaer Polytechnic Institute, 505 F.3d 135, 138 (2d Cir. 2007) ("It is a general principle of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is presumed that Congress acts intentionally and purposely.")).  While courts have found that ILSA is a remedial statute intended to protect consumers and requires ambiguities concerning exemptions to be construed narrowly, Gentry v. Harborage Cottages-Stuard, LLLP, 602 F. Supp. 2d 1239, 1248 (S.D. Fla. 2009), no ambiguity in the Hundred Lot Exemption exists given Congress' omission of a timing requirement or requirement that the developer disclose at the time of purchase what *other* exemption it intends to utilize for any lots outside the Hundred Lot Exemption.

The cases cited by the plaintiff are unpersuasive on the issue of statutory interpretation. In 200 East Partners, LLC., v. Gold, 997 So.2d 466, 469 (Fla. App. 4 Dist. 2008), a Florida state court found that sales agreements for the sixteen apartments sold in excess of ninety-nine units could not be modified to comply with the improved lot exemption *after* the sale of the initial ninety-nine units. The court, however, did not base its holding on the plain language of the exemptions as laid out in the statute, rather, it relied on its reading of the Guidelines issued by HUD, which are discussed below.  Additionally, in Ahn v. Merrifield Town Center Ltd., 584 F.

Supp. 2d 848 (E.D. Va. 2008), the court examined the portion of the Improved Lot Exemption allowing developers to exempt lots where the seller agrees to complete the dwelling within two years. The court found that triggering event for the two-year period was the buyer's signing of the sales contract. Ahn, 584 F. Supp. 2d at 853. This analysis makes sense given that the Improved Lot Exemption applies to those plaintiff's specific units, and the very point of the exemption is to notify buyers that their lots will be completed in two years. This analysis, however, does not shed light on whether a developer can utilize the Hundred Lot Exemption and the Improved Lot Exemption without notifying the buyers of units whose lots fall under the Hundred Lot Exemption at the time of their purchase agreements.

   3.  *The Applicable Regulations and HUD Guidelines Support the Plain Reading of the Statute*

Once a statute is found to be unambiguous, deference to an agency's interpretation of the statute is not necessary. See United Airlines, Inc. v. Brien, 588 F.3d 158, 172 (2d Cir. 2009) ("Deference to an agency's statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." (citing Gen. Dynamics Land Sys. v. Cline, 540 U.S. 581, 600 (2004)). Nevertheless, as the court in Bodansky found, the interpretation of the Hundred Lot Exemption discussed above is consistent with the regulations issued by HUD. Bodansky, 2010 WL 334985 at *5.

In accordance with 15 U.S.C. § 1718, HUD has promulgated regulations as well as interpretive guidelines for ILSA and the relevant exemptions. See 15 U.S.C. § 1718. The Hundred Lot Exemption is set forth in 24 C.F.R. § 1710.6, which reads, "the sale of lots in a subdivision is exempt from the registration requirements of the Act if, since April 28, 1969, the subdivision has contained fewer than 100 lots, exclusive of lots which are exempt from

jurisdiction under" § 1710.5, the regulation covering the Improved Lot Exemption. 24 C.F.R. §

1710.6.  As the court in Bodansky points out, there is no requirement in the regulation that the

determination of which units in a condominium are "exempt from jurisdiction under § 1710.5"

occur at the time of the sale of a particular lot. Bodansky, 2010 WL 334985 at *5.

Additionally, according to the regulations, a developer's eligibility for exemptions under

ILSA is "self-determining," 24 C.F.R. § 1710.4(d), that is, a "developer is not required to file

notice with or obtain the approval of [HUD] in order to take advantage of an exemption." Id.; see

also Bodansky, 2010 WL 334985 at *5.  This regulatory scheme supports the conclusion that

under the statute, a developer need not disclose the intent to utilize an exemption or combination

of exemptions at the time of the purchase agreements for the first ninety-nine lots sold. Id. at *6.

The parties also disagree on the proper interpretation of HUD's "Guidelines" for

exemptions under ILSA.  These guidelines "clarify agency policies and positions with regard to

the exemption provisions of [ILSA] and its implementing regulations." See Guidelines for

Exemptions Available under the Interstate Land Sales Full Disclosure Act, 61 Fed.Reg. 13,596,

13,601 (Mar. 27, 1996).  While guidelines "are not formally promulgated as regulations, such

agency publications are at least a body of experience and informed judgment to which courts and

litigants may properly resort for guidance." Conroy v. New York State Dept. of Correctional

Services, 333 F.3d 88, 95 (2d Cir.2003) (citation omitted); see also Bodansky, 2010 WL 334985

at *6.[7]

The guidelines offer several illustrations, including the following:

For example, a developer of a subdivision containing a total of 129 lots since April 28,
1969, qualifies for [the Hundred Lot Exemption] if at least 30 lots are sold in transactions
that are exempt because the lots had completed homes erected on them. The 30 exempt

---

[7] The court in Bodansky also noted that the HUD Guidelines for ILSA were not simply promulgated by HUD in an
informal process, but went through a public comment and review process similar to that for regulations. Bodansky,
2010 WL 334985 at *6, n. 11 (citing 49 Fed.Reg. at 31,375).

transactions may fall within any one exemption or a combination of exemptions noted in [24 C.F.R.] § 1710.5 [including the Improved Lot Exemption] ... *and may be either past or future sales*. In the above example, the developer also could qualify if twelve lots had been sold with residential structures already erected on them, nine lots had been sold to building contractors and at least nine lots were reserved for either the construction of homes by the developer or for sales to building contracts. *The reserved lots need not be specifically identified.*

Developers of subdivisions containing more than 99 lots who wish to operate under this exemption *must assure themselves that all lots in excess of 99 have been and will be sold in transactions exempt* under 24 CFR 1710.5 (b) through (h). The sale of more than 99 lots in transactions not exempt under §1710.5 (b) through (h) would nullify this exemption for prior and future sales and might result in prior sales being voidable at the purchaser's option.

61 Fed. Reg. 13596, 13604 (emphasis added).  Because the lots in excess of ninety-nine sold pursuant to *another* applicable exemption may be past or future sales, and because such lots need *not* be specifically identified, this illustration suggests that HUD does not require that the Hundred Lot Exemption be determined at the time of a sale of a particular lot in a subdivision. See Bodansky, 2010 WL 334985 at *6.  Instead, developers must simply "assure themselves" that all lots in excess of ninety-nine fall under another applicable exemption, such as the improved lot exemption, and neither the HUD regulations or guidelines require this assurance to come at the time of the purchase agreements are executed.

The parties also disagree on the appropriate weight to give HUD's two Advisory Opinions issued specifically for the projects at issue.  The July 17, 2009 Advisory Opinion was cited by defendants in Bodansky, where the court found that "[a]dvisory opinions, unlike regulations produced pursuant to 'a formal adjudication or notice-and-comment rulemaking,' do not have 'the force of law.'" Id. at * 7, n. 12 (citing Christensen v. Harris County, 529 U.S. 576, 587 (2000)).  The court also found that "interpretations contained in an advisory opinion 'are entitled to respect . . ., but only to the extent that those interpretations have the power to persuade.'" Id. (citations omitted).  The court in Bodansky did not consider the July 17, 2009

HUD advisory opinion because it found that HUD failed to explain its reasoning, and regardless, the court found the text of § 1702(b)(1) to be unambiguous. Id.

As discussed above, I also find the text of the relevant statutory exemption to be unambiguous, and thus need not reach the issue of whether the HUD Advisory Opinions are entitled to weight on the issue of when applicability of the exemption is measured. While both Advisory Opinions assume that the Hundred Lot Exemption and the Improved Lot Exemption can be combined, and only differ on the issue of whether the parking spaces and roof terrace units are "lots" for purposes of the exemptions, neither opinion explains its reasoning or analysis of the statute or regulations that set forth the exemptions. Thus, the opinions have not factored into my conclusion that the applicability of the Hundred Lot Exemption is not measured at the time of the purchase agreements.

4. *The Use of Two Applicable Exemptions is Not "Purposeful Evasion" of ILSA*

Plaintiffs also contend that the defendants utilized the combination of the Hundred Lot Exemption and the Improved Lot Exemption for "the purpose of evasion" of ILSA's requirements in violation of § 1702. Plaintiffs argue that defendants did not know about ILSA's requirements until plaintiffs' rescission letters, and thus cannot now assert that the use of the two defenses constitutes a "legitimate business purpose" that some courts have required for qualification of an exemption. See, e.g., Gentry, 602 F. Supp. 2d at 1248; Double AA Intern. Inv. Group, Inc. v. Swire Pacific Holdings, Inc., 2009 WL 4825097, at *11 (S.D. Fla. Dec.15, 2009).

Like the court in Bodansky, I find that defendants have not adopted the exemptions at issue for the purposes of evading ILSA's requirements. It is difficult to imagine how the defendants adopted such a plan if they were in fact unaware of ILSA's requirements prior to receipt of the first plaintiff's rescission letter in January of 2009. Once defendants learned of

ILSA's requirements, their efforts to comply with the Act and its exemptions should not be read as purposeful evasion. <u>Bodansky</u>, 2010 WL 334985 at *8. Additionally, since the remaining units were sold following the issuance of a TCO, the only possible "method of disposition" for the remaining units was and is to sell them as improved units, which are exempt under § 1702(a)(2). This is the case even if this "method of disposition" was not originally specified in a formal and disclosed "plan." <u>Id.</u>

> ### 5. *Parking Units and Roof Terrace Units Are Not "Lots" Under ILSA*

Plaintiff's final argument is that defendants failed to account for the sale of twelve roof terrace units and parking units that were sold prior to the issuance of the TCO, and that these units count as "lots" for purposes of the Hundred Lot Exemption. If such units are counted as separate lots, then defendants would be required to add the twelve sales to the ninety-eight residential units sold, rendering the Hundred Lot Exemption unavailable. Defendants concede that each roof terrace and parking space unit available at Hunters Point and Hunters View has a separate block and lot, that roof terrace units and parking spaces are taxed separately from any residential unit, that such units are not directly adjacent to residential units, and that any purchaser of a roof terrace unit or parking space unit may sell or convey the unit to another residential unit owner. For the reasons discussed below, I find that the roof terrace units and parking units are not "lots" for purposes of the Hundred Lot Exemption.

Lot is not defined anywhere in ILSA. The Regulations, however, define "lot" as "any portion, piece, vision, unit or undivided interest in land . . . if the interest includes the right to the exclusive use of a specific portion of the land." 24 C.F.R. § 1710.1(b). As discussed above, courts have found that residential condominium units are "lots" under the statute. These courts have found that:

The Act accomplishes [its] goal by including within it all sales of lots and then exempting a number of transactions, including sales of fully improved property.  It is reasonable to conclude, as HUD did, that the term "lot" was used to refer generally to interests in realty.  The legislative history supports this construction, employing the terms "lot," "land," and "real estate" in discussing the Act.  This construction is also reasonable in terms of the purpose of the statute.  A fraudulent out-of-state sale of land is not rendered any less fraudulent if the condominium form of ownership is utilized.

Winter v. Hollingsworth Properties, 777 F.2d 1444, 1448 (11th Cir. 1985) (footnote omitted); see also Beauford v. Helmsley, 740 F.Supp. 201, 209-10 (S.D.N.Y. 1990).

In Trotta v. Lighthouse Point Land Co., LLC, 551 F. Supp. 2d 1359, 1363 (S.D. Fla. 2008), rev'd on other grounds, 319 Fed.Appx. 803, 805 n. 2. (11th Cir. 2008), the district court examined the issue of whether storage units were "lots" for purposes of the Hundred Lot Exemption.  The court first discussed the purpose of ILSA and the Hundred Lot Exemption, stating that "because the ILSA is intended to protect homebuyers . . ., its exemptions for small developments are most naturally interpreted as related to the number of *homes* for sale in a particular development." Trotta, 551 F. Supp. 2d at 1363 (emphasis added).  The court further stated that through the Hundred Lot Exemption, "Congress demonstrated a sensitivity to the size of the development it was regulating." Id.  The court concluded that a "development does not become meaningfully larger, in the sense that consumers are more likely to need regulatory protection from sophisticated sellers, merely because interests in storage spaces (or parking spaces) are sold along with the residential units." Id. at 1363.  On appeal, the Eleventh Circuit reversed the district court's finding of another ISLA violation, but specifically found "no merit" in the argument that the project contained more than one hundred lots. Trotta, 319 Fed.Appx. at 805 n. 2.

In this case, sales of residential units and the roof terrace and/or parking spaces were made by single contracts, and if the purchases had been closed, the buyers would have received a

single deed. (Pls.'s Ex. 11, 13; Joint Statement of Facts ¶ 9.)  Additionally, under the Offering

Plan and By-laws, buyers are only permitted to convey their interest in roof terrace units to other

residential unit owners within Hunters Point, and are restricted to conveying their parking spaces

to residential unit owners in either Hunters Point or Hunters View.[8] (Condominium Offering

Plan for One Hunters Point, Defs.' Ex. P. at 24, 90; By-Laws of One Hunters Point

Condominium, Defs.' Ex. P at 322.)  Plaintiffs argue that the defendant, as Sponsor, is permitted

to sell unsold parking and residential units to buyers "other than a Residential Unit Owner."

Because of conflicting sections of the Offering Plan, it is not clear that the defendant can in fact

sell roof terrace units and parking spaces to non-Residential Unit owners.[9]  Even if the

defendants were permitted to do so, however, defendants' purchaser would not in turn be

permitted to sell to any interested buyer.  Rather, he would be restricted under the Offering Plan

and By-Laws to selling only to an owner or purchaser of a residential unit.  Additionally, there is

no indication that any of the twelve parking spaces or roof terrace units sold prior to the issuance

of the TCO *were* sold independently of residential units.

      Given the restrictions on conveyance for parking units and roof terrace units, theses units

have no functional or practical existence separate from a residential unit, such that purchasers are

entitled to greater protection under the Act.  As the district court in <u>Trotta</u> stated, "[i]t would not

---

[8] Plaintiffs argue that the Thirteenth Amendment to the Offering Plan expanded the ability of parking space unit purchasers to sell to purchasers "located outside the building in which their residential unit was located." (Pls.' Br. in Opp. at 31.)  However, the Amendment only permits the conveyance to "the then present owner, or a pending purchaser, of a residential unit at Hunters *View* Condominium," not *any* interested buyer.  Amendment No. 13 to the Offering Plan, No. 09-cv-665, Dkt. No. 26-29, at 5 (emphasis added).

[9] In the section titled "Rights and Obligations of Unit Owners," the Offering Plan does state that the "restrictions on the sale or conveyance of a Roof Terrace Unit [or Parking Space Unit] shall not apply to Sponsor," and that the sponsor "shall be free to sell or convey a Parking Space Unit [or Roof Terrace Unit] to other than a Residential Unit Owner." (Condominium Offering Plan for One Hunters Point, Defs.' Ex. P. at 90.)  In the section titled "Description of Property and Improvements," however, the Offering Plan states that Roof Terrace Units and Parking Space Units "may only be owned by Sponsor and Residential Unit Owners.  Thus, a Purchaser cannot purchase a Roof Terrace Unit [or Parking Space Unit] without a concomitant purchase of a Residential Unit." (Condominium Offering Plan for One Hunters Point, Defs.' Ex. P. at 24.)

make sense to extend the partial exemption contained in § 1702(b) to a building with sixty condominium units, but deny the § 1702(b) exemption to that same building if each unit owner also had the right to use a particular storage space or parking space." The mere fact that the roof terrace units and parking units have separate legal descriptions, and owners are able to convey them to other residential unit owners or purchasers does not alter this conclusion.

Plaintiffs rely on Giralt v. Vail Village Inn Accoc., 759 P.2d 801, 808 (Colo. Ct. App. 1988) for support. In Giralt, a Colorado state court stated that "since the parking units are interests in real estate and a form of ownership of space to which the owners have the right to exclusive use, we conclude they are lots within the meaning of the Act." Giralt, 759 P.2d at 808. However, as defendants point out, in Giralt, the developer's declaration stated that the project was "divided into 141 condominiums (including the 107 parking condominiums)," parking units were sold separately to outside purchasers rather than as ancillary amenities, and there was no indication that owners of parking spaces had any restrictions on conveyance. Id., see also Defs.' Answering Decl. in Support of Mot. for Summary Judgment ¶ 8.[10]

The parties again disagree on the relevance of the two HUD Advisory Opinions on the issue of parking and roof terrace units. In the July 15, 2009 Opinion, HUD indicated that "the Declaration creates the parking space units and roof top terraces as separate and distinct units and therefore should be counted along with the residential units for the purpose of the 100 lot exemption." (July 15, 2009 Advisory Opinion, Defs.'Ex. J.) In the July 17, 2009 Opinion, HUD acknowledged the existence of the parking space units and roof terrace units, but did not discuss

---

[10] Defendants submitted an affidavit from a named defendant in Giralt, stating that it was the intention of the sponsor to permit the sale of Parking Units to individuals or entities other than the owners of residential condominium units of the property, and that "some of the Parking Units in Village Inn Plaza have been sold to individuals or entities which do not own residential condominiums, and continue to be sold and resold to this day." (Defs.' Answering Decl. in Support of Mot. for Summary Judgment ¶ 8.) As plaintiffs have not opposed defendants' affidavit with respect to the parking lots at issue in Giralt, the facts recited therein are undisputed for purposes of these cross-motions.

their status as "lots" when determining that the projects are exempt from ILSA's requirements based on the sale of ninety-eight residential units. (July 17, 2009 Advisory Opinion, Defs.'Ex. K.)  While the latter opinion would seem to overrule the former,[11] because HUD did not explain its reasoning for the exclusion of the parking spaces and roof terrace units in counting the number of "lots" sold pursuant to the Hundred Lot Exemption, I have not considered the Opinion persuasive on the matter, and rely simply on the reasoning set forth above. See Christensen v. Harris County, 529 U.S. 576, 587 (finding that interpretations contained in an advisory opinion "are entitled to respect . . ., but only to the extent that those interpretations have the power to persuade.") (citations omitted).

Because of the restrictions on conveyance for parking units and roof terrace units, I find that these units have no practical existence independent from the residential condominium units. The existence of the roof terrace and parking units thus does not warrant removing the projects at issue from the Hundred Lot Exemption.

**CONCLUSION**

Defendants' projects are exempt from ILSA's registration and disclosure requirements pursuant to the Hundred Lot Exemption, 15 U.S.C. § 1702(b)(1), and the Improved Lot Exemption, 15 U.S.C. § 1702(b)(2). Plaintiffs' motions for partial summary judgment seeking rescission of their purchase agreements, return of their deposits, and interest and attorneys' fees are denied.  Defendants' motions for summary judgment are granted.  The Clerk of Court shall enter judgment in each captioned case accordingly.

---

[11] In an email dated July 23, 2009 in response to an inquiry, a Consumer Protection Compliance Specialist at HUD indicated that "the July 17, 2009 Advisory Opinion is to be considered the most current Advisory Opinion on the matter." (Defs.' Ex. L.)  HUD currently lists the projects as "exempt" on its website. (Joint Statement of Facts ¶ 39.)

SO ORDERED.

                                                    s/ ARR

                                        _____

                                        Allyne R. Ross
                                        United States District Judge


Dated:          March 11, 2010
                Brooklyn, New York